# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 50826-5-II |
| Respondent, | |
| v. | |
| JOSE R. MORENO-HERNANDEZ, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — Jose Moreno-Hernandez appeals his conviction for attempted rape in the second degree. He first argues that the State committed prosecutorial misconduct on numerous instances, which violated his right to a fair trial. Second, Moreno-Hernandez argues that the trial court erroneously admitted hearsay statements. Finally, he argues that his judgment and sentence contains an unconstitutionally vague community custody condition ordering him to have "no contact" with minors and that it contains unauthorized legal financial obligations (LFOs).

We affirm the conviction but remand for the trial court to reconsider the imposition of LFOs.

## FACTS

Nelbis Moreno gave birth to RY in El Salvador. When RY was five years old, Moreno left her in El Salvador and went to the United States. Moreno then married Moreno-Hernandez.

At 13 years of age, RY followed her mother to the United States and moved into an apartment with her and Moreno-Hernandez. At the time, RY was pregnant. She gave birth three months later.

One evening, RY called the police alleging that Moreno-Hernandez attempted to rape her. The police arrived and talked with RY. RY's uncle, Ruben Arevalo, and cousin also arrived and helped interpret RY's statement for the police. Arevalo then transported RY to the care of Child Protective Services. Yanilda Dafe became RY's foster parent.

The State charged Moreno-Hernandez with attempted rape in the second degree and child molestation in the third degree.

## I.    TRIAL AND SENTENCING

The case proceeded to trial where the State argued Moreno-Hernandez committed attempted rape and RY's testimony had credibility. In support of its theory, the State argued that RY's allegation had turned her whole family against her, but they would have returned to her side if she recanted her story. Nonetheless, RY did not recant.

Moreno-Hernandez argued that RY had a motive to lie because she felt her mother abandoned her in El Salvador and, as a result, she resented Moreno-Hernandez. Numerous witnesses at trial, including RY and Moreno, required Spanish interpreters.

### A.    RY's Testimony

After RY described the attempted rape and how she had spoken with the police following the incident, the prosecutor asked her: "When you told the police officers what happened, did you tell them—you probably did not tell them exactly the same words that you used here today; is that right?" 4 Report of Proceedings (RP) at 774. Moreno-Hernandez objected to the question as leading. The court overruled the objection. RY responded that different interviewers asked her different questions, which explained some of the inconsistencies in her description of the incident.

RY testified that she did not see Moreno until the day after the incident. RY said that at that time, Moreno told her to "tell the truth." 5 RP at 838. The prosecutor then asked RY: "What,

if any, bad consequences did [Moreno] say would result if you didn't take back your report?" 5 RP at 840. Moreno-Hernandez objected on hearsay grounds. The court overruled the objection. RY answered that Moreno told her to tell the truth or Moreno would take RY's child away from her.

RY also testified that two days after the incident, her aunt texted her. The prosecutor asked RY: "did your [aunt] ever send you any text messages about what you should do regarding your report about what [Moreno-Hernandez] did to you?" 5 RP at 846. Moreno-Hernandez objected on hearsay grounds. The court overruled the objection. RY answered: "[My aunt] did send me a message. . . . [And] what I understood was that she was seeming to ask me to lie; that way I could go back to my mother. . . . [T]o say as if that what I alleged happened had not happened." 5 RP at 883.

B.      Dafe's Testimony

During Dafe's testimony, the prosecutor asked: "Did [RY] ever give you details about what happened to her . . . ?" 7 RP at 1145. Dafe answered: "Yes, she did." 7 RP at 1145. The prosecutor then asked: "And what did she say happened?" 7 RP at 1145. Moreno-Hernandez objected, and the court sustained the objection. The prosecutor then said:

> Just to make my record, Your Honor, it's a consistent statement regarding—and goes directly to [RY's] credibility. She has been consistent to every person she's spoken to, and this merely explains and exemplifies that.

7 RP at 1145.

C.      Moreno's Testimony[1]

Moreno testified that on the night of the incident, her sister called to tell her that RY had called. The prosecutor asked: "And what did [your sister] indicate [RY] had said?" 7 RP at 1251. Moreno responded: "[Moreno-Hernandez] has been molesting her." 7 RP at 1251. Moreno stated that because she had no way to get home, she continued working until the manager drove her home after her shift.

The following interaction then took place:

> [Prosecutor:] So you got a call . . . that indicated [RY] said that [Moreno-Hernandez] had molested her; you didn't ask your manager for a ride home at that moment?
> . . . .
> [Moreno:] Yes. I asked for the ride, but there was no other employee working or another manager to take care of the store.
> [Prosecutor:] So you're telling me that you told your manager, "My daughter just told me she's being molested," and he said, "I won't give you a ride home"?
> [Moreno:] Well, to tell you the truth, I couldn't express myself like that because I don't speak English.

7 RP at 1253. Shortly thereafter, the court recessed for the day. After the court dismissed the jury, the interpreter informed the court that she had misinterpreted the word "molesting" from Moreno's testimony and that the appropriate interpretation was "bothering" or "mistreating." 7 RP at 1260.

The following morning, the interpreter explained the error to the jury. The State then examined Moreno as follows:

> [Prosecutor:] . . . [W]hat exactly did your sister . . . say when she called you?
> [Moreno:] Well, that [RY] had called my sister and that [Moreno-Hernandez] was pestering or annoying her.
> [Prosecutor:] And at some point during that conversation with your sister, you understood that the accusation that [RY] was making was that [Moreno-Hernandez] had sexually molested her that evening, correct?

---

[1] Moreno testified in Spanish. The English translation is from the interpreter speaking in English at trial.

4

[Moreno:] No. I didn't think that because [my sister] had never told me that he had annoyed [RY] in that manner.

[Prosecutor:] Yesterday when I asked this question, you told us . . . your sister called and told you that . . . [RY] had said that [Moreno-Hernandez] was bothering or annoying her, correct?

[Moreno:] Yes. Just annoying, bothering, pestering. That's it.

. . . .

[Prosecutor:] When we asked that question, we had this same set up, correct?

[Moreno:] Yes.

[Prosecutor:] So there was one interpreter interpreting my questions and another interpreter interpreting your answers, correct?

[Moreno:] Yes.

[Prosecutor:] Okay. And . . . you used the word "*molestar*," correct?

[Moreno:] Yes. That's so.

[Prosecutor:] But then I asked the question, "You were aware"—or something to the effect that you knew that [RY] was saying that [Moreno-Hernandez] had molested [RY], correct?

[Moreno:] I was not conscious of this because [my sister] had not said anything to me, as I will repeat again.

[Prosecutor:] So—but isn't it correct that the interpreter who was interpreting questions for me did not use the word "*molestar*"?

8 RP at 1269-71. Moreno-Hernandez objected, arguing that "if we need to take testimony from the interpreter, [he was] going to need an opportunity to interview th[e] interpreter." 8 RP at 1271.

The court stated that it would address Moreno-Hernandez's issue later.

The prosecutor then continued:

[Prosecutor:] When I asked the followup question, I used the word—the word that was translated to you was *abuso deshonesto*, correct?

[Moreno:] My sister never said at any moment that he was being sexually inappropriate or that he had been naked or anything like that.

[Prosecutor:] That's not the question I just asked you; is it, [Moreno]? Is it?

[Moreno:] But it's the same thing. It's the same thing when you're talking about sexual inappropriateness. And if that's not how I should understand it, explain it to me.

[Prosecutor:] So I'm going to repeat my question.

My question is, when I asked the followup question yesterday, the verb that was translated from my question was not *molestar*. It was *abuso deshonesto*, correct?

[Moreno:] Well, I don't remember that you had—if you asked me that question.

5

[Prosecutor:] Okay. So you don't recall what you testified to yesterday afternoon?

. . . .

[Moreno:] Of course I did.

8 RP at 1272-74.

Moreno then testified about her conversation with her brother, Arevalo, the morning after the incident. The following interaction took place:

[Moreno:] [Arevalo] said that . . . [Moreno-Hernandez] had been bothering, annoying, or pestering [RY].

[Prosecutor:] You used that verb *molestar* again just now.

[Moreno:] Yes. Because they didn't give me any explanation concerning what it was about.

[Prosecutor:] Okay. So [Arevalo], when he spoke to you, only told you— only used the verb *molestar* to describe what [RY] had said about what [Moreno-Hernandez] had done to her.

[Moreno:] Yes. That's so.

[Prosecutor:] Just like you're saying that [your sister] only used the word *molestar*, correct?

[Moreno:] Yes.

[Prosecutor:] And was it your understanding that [Arevalo] was there when [RY] made the report to the police officers?

[Moreno:] Well, he told me that, when he arrived, the police was already there.

[Prosecutor:] Sure. My question is, when you say that [Arevalo] used the word *molestar*, is it your understanding [Arevalo] observed the report that [RY] made to the police?

[Moreno:] Yes. That's so.

[Prosecutor:] If we're talking about someone taking down the pants of a 14-year-old girl and forcibly rubbing their penis between their leg, would you call that *molestar* . . . ?

[Moreno:] I didn't know anything about that.

[Prosecutor:] That's not my question; is it?

My question is, that situation I described, where someone forcibly removes the pants of a 14-year-old girl and rubs their penis between her legs, would you use the word *molestar* . . . to describe that action?

[Moreno:] No. It's different.

[Prosecutor:] Right. That's *abuso deshonesto* . . . isn't it?

8 RP at 1286-87. Moreno-Hernandez objected to "the use of Spanish in an English-speaking courtroom." 8 RP at 1287. The court overruled the objection. The prosecutor then pursued a

6

different line of questioning, and Moreno never answered the question. During a later colloquy, the court told Moreno-Hernandez that it would permit him to call an interpreter as a witness to clarify the meaning of the Spanish words used or for any additional clarification.

D.      Closing Argument

At one point in its closing argument, the State discussed the details of the attempted rape. It then stated to the jury that RY "explained to you very honestly about how [the attempted rape] occurred." 9 RP at 1508.

E.      Conviction and Sentencing

The jury found Moreno-Hernandez guilty of both counts. The child molestation conviction merged into the attempted rape in the second degree conviction.

The court sentenced Moreno-Hernandez to 60 months to life imprisonment. The court found Moreno-Hernandez indigent. It imposed LFOs, including a criminal filing fee. In addition, the court ordered that interest accrue on the financial obligations until paid in full. As a condition of Moreno-Hernandez's sentence, the court ordered that he have no contact with minors. Moreno-Hernandez appeals.

ANALYSIS

I.      PROSECUTORIAL MISCONDUCT

Moreno-Hernandez argues that numerous instances of prosecutorial misconduct plagued his trial and violated his constitutional right to a fair trial. We disagree.

A.      Legal Principles

"Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012). To prevail on a claim of prosecutorial misconduct, a defendant must "show that in the context of the record

7

and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." *Glasmann*, 175 Wn.2d at 704.

"'Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard.'" *State v. Thorgerson*, 172 Wn.2d 438, 460, 258 P.3d 43 (2011) (quoting *State v. Brett*, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995)). We review the prosecutor's conduct and whether prejudice resulted therefrom "by examining that conduct in the full trial context, including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (internal quotation marks omitted) (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). During closing argument, a prosecutor has "wide latitude in drawing and expressing reasonable inferences from the evidence." *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991). But a prosecutor may not argue facts not in evidence or make arguments appealing to a jury's passion that prejudices the defendant. *State v. Belgarde*, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988); *State v. Boehning*, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).

In a prosecutorial misconduct claim, a defendant who fails to object to improper conduct may be deemed to have waived the issue on appeal unless the prosecutor's statements are so flagrant and ill-intentioned that the resulting prejudice could not be corrected by a jury instruction. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). The defendant must show that (1) no curative instruction would have eliminated the prejudicial effect, and (2) the misconduct

resulted in prejudice that had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 761. The focus of this inquiry is more on whether the resulting prejudice could have been cured, rather than the flagrant or ill-intentioned nature of the remarks. *Emery*, 174 Wn.2d at 762.

### B. Acted as Advocate-Witness

Moreno-Hernandez argues that the prosecutor violated the advocate-witness rule when he paraphrased the testimony of RY and when he discussed how his questions had been interpreted. We disagree.[2]

An attorney cannot appear both as a witness and as an advocate in the same litigation. *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014).

We conclude that the prosecutor here did not act as an advocate-witness. The record shows that, after the interpreter corrected the error, an unusual exchange followed. The prosecutor wanted to inquire as to whether the interpreter had in fact made a misinterpretation; therefore, he questioned whether Moreno learned of sexual abuse on the night of the incident and still defended Moreno-Hernandez. Consequently, the prosecutor asked questions designed to reveal when Moreno learned that the alleged abuse was sexual in nature. He sought clarification on whether Moreno had understood his question before the misinterpretation and whether she had understood his follow-up questions following the misinterpretation. Although other and probably better approaches existed for the prosecutor to determine whether Moreno understood his questions, the prosecutor's line of questioning did not violate the advocate-witness rule.

---

[2] We also reject the State's argument that Moreno-Hernandez did not preserve this issue for appeal. Additionally, Moreno-Hernandez preserved his arguments that the prosecutor introduced extrinsic evidence and usurped the role of interpreter as an expert.

C.     Introduced Extrinsic Evidence

Moreno-Hernandez argues that the prosecutor never obtained the record of proceedings and relied on his memory and personal knowledge of the meaning of the Spanish words. As a result, Moreno-Hernandez argues that the prosecutor erred by introducing extrinsic evidence. We disagree.

"It is misconduct for a prosecutor to submit extrinsic evidence to a jury." *State v. Vassar*, 188 Wn. App. 251, 259, 352 P.3d 856 (2015). Extrinsic evidence is information outside what is presented at trial. *Vassar*, 188 Wn. App. at 259.

We conclude that the prosecutor did not improperly submit extrinsic evidence. Moreno-Hernandez bases his argument on cases where prosecutors argued, *in closing*, evidence outside the record. Here, the challenged conduct occurred during the State's case-in-chief.

After the interpreter informed the court and the jury of the error, the prosecutor asked Moreno whether she had understood his initial question and his follow-up questions from the previous day. In formulating follow-up questions, the prosecutor reflected on his memory of Moreno's testimony and his memory of the Spanish words used to interpret his questions and her responses. Although the prosecutor could have taken a different approach, we conclude that the prosecutor did not submit extrinsic evidence to the jury in his exchange with Moreno.

D.     Usurped Role of Expert

Moreno-Hernandez argues that "[t]he prosecutor usurped the role of the expert interpreter by his questioning of [Moreno] about the Spanish language translation." Br. of Appellant at 23. According to Moreno-Hernandez, the prosecutor then used his interpretation to improperly impeach Moreno. If any error occurred, it was harmless.

10

Evidence, even if otherwise relevant, without adequate foundation is not relevant because it is not useful in making material facts more or less likely. *See* 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 611.5, at 532 (6th ed. 2016); *see also State v. Swan*, 114 Wn.2d 613, 659, 790 P.2d 610 (1990). Where the subject matter of testimony is beyond the common knowledge and understanding of the average person, expert testimony is appropriate to assist the jury. ER 702; *State v. Ciskie*, 110 Wn.2d 263, 274, 751 P.2d 1165 (1988).

After the misinterpretation and subsequent correction by the interpreter, a fairly unique exchange occurred between the prosecutor and witness. After being informed of the misinterpretation, the prosecutor asked Moreno whether she had understood his initial and follow-up questions. In asking the questions, the prosecutor relied on his memory regarding his examination of Moreno the previous day.

Although it probably would have been better to call the interpreter as a witness as to what she did, we cannot say the prosecutor erred in his examination of Moreno.

However, even if this line of questioning usurped the role of the interpreter, any error was harmless. Moreno vehemently denied the prosecutor's insinuations that she learned of the sexual nature of the abuse the night of the incident while at work. In response to each of the prosecutor's questions, Moreno stated that she did not learn the abuse was sexual in nature the night of the incident. Thus, if any clarity resulted from the prosecutor's line of questioning, it was the fact that Moreno did not learn that the abuse was sexual in nature on the night of the incident. Furthermore, the court stated to Moreno-Hernandez that it would permit him to call an interpreter as a witness to clarify the meaning of the Spanish words used or for any additional clarification. Moreno-Hernandez decided not to call an interpreter. Accordingly, if error occurred, it was harmless.

E.      Referred to Out-of-Court Statements

Moreno-Hernandez argues that the prosecutor improperly vouched for RY's reliability when he referred to inadmissible, out-of-court statements she made that were consistent with her in-court testimony. We conclude that the statement in response to the court's ruling was error, but because Moreno-Hernandez did not object to the statement, we also conclude that he waived the issue.

Moreno-Hernandez objected to the State's proposed question about whether RY had told Dafe about Moreno-Hernandez's abuse. After the court ruled that the question called for hearsay, the State then said:

> Just to make my record, Your Honor, it's a consistent statement regarding—and goes directly to [RY's] credibility. She has been consistent to every person she's spoken to, and this merely explains and exemplifies that.

7 RP at 1145. The State concedes the prosecutor's comment was improper. However, Moreno-Hernandez did not object. Therefore, to prevail in his claim of prosecutorial misconduct, Moreno-Hernandez must show that the prosecutor's statements were so flagrant and ill-intentioned that the resulting prejudice could not be corrected by a jury instruction. *Emery*, 174 Wn.2d at 760-61.

We conclude that any prejudice could have been cured by an instruction. The court could have instructed the jury to disregard the comment and only rely on the testimony admitted by the court. The State's comment was not highly inflammatory such that it could not have been cured by an instruction, and thus, we conclude that Moreno-Hernandez waived the issue on appeal.

F.      Commented on RY's Reliability

Moreno-Hernandez argues that the prosecutor improperly commented on RY's reliability at two other points during trial. We disagree.

It is improper for a prosecutor to state a personal belief as to the credibility of a witness. *Brett*, 126 Wn.2d at 175. A statement is prejudicial only if it is a "'clear and unmistakable'" expression of a personal opinion. *Brett*, 126 Wn.2d at 175 (quoting *State v. Sargent*, 40 Wn. App. 340, 344, 698 P.2d 598 (1985)). A prosecutor enjoys wide latitude to argue reasonable inferences from the evidence concerning witness credibility. *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008).

Moreno-Hernandez first argues that the prosecutor made an impermissible comment on RY's reliability when he asked her: "'you probably did not tell them exactly the same words that you used here today; is that right?'" Br. of Appellant at 28 (quoting 4 RP at 774). We disagree.

The prosecutor's question implied that RY made prior inconsistent statements regarding the specific details of the attempted rape. This question was not a clear and unmistakable expression of his personal opinion regarding RY's credibility or reliability. Therefore, even if the question was improper, it was not prejudicial.

Furthermore, the use of leading questions with child witnesses is within the discretion of the trial court. *State v. Allen*, 70 Wn.2d 690, 692, 424 P.2d 1021 (1967); *State v. Canida*, 4 Wn. App. 275, 279, 480 P.2d 800 (1971). We conclude that the prosecutor's question to RY did not constitute misconduct.

Moreno-Hernandez next argues that the prosecutor made an impermissible comment on RY's reliability when he told the jury in his closing argument that she had testified "'very honestly.'" Br. of Appellant at 28 (quoting 9 RP at 1508). We disagree.

Moreno-Hernandez failed to object to the prosecutor's comment in closing, and thus he waived the issue. The comment was not so flagrant and ill-intentioned that the resulting prejudice could not have been corrected by a jury instruction.

G.       Cumulative Error

Moreno-Hernandez argues that the multiple instances of prosecutorial misconduct constituted cumulative error and that the cumulative error prejudiced him.  We disagree.

"Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless."  *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).  Without error, the cumulative error doctrine does not apply.  *State v. Clark*, 187 Wn.2d 641, 655, 389 P.3d 462 (2017).  Cumulative error "does not apply where the errors are few and have little or no effect on the outcome of the trial."  *Weber*, 159 Wn.2d at 279.

Here, there was no cumulative error that requires reversal of the convictions.

II.      HEARSAY

Moreno-Hernandez argues that "[t]he hearsay statements of R.Y.'s mother and aunt [were] . . . inadmissible because they [were] not relevant to an issue in controversy."  Br. of Appellant at 33.  We disagree.

"A party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial."  *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985); *see* ER 103(a); RAP 2.5(a).  At trial, Moreno-Hernandez argued that the statements were inadmissible because they were hearsay.  On appeal, he argues that the statements were inadmissible because they were not relevant.  Because Moreno-Hernandez is appealing on a different ground than his objection at trial, we conclude that his argument on appeal is not preserved.

III.     COMMUNITY CUSTODY CONDITION

Moreno-Hernandez argues that the term "no contact" in his community custody condition, which prevents him from contacting minors, is unconstitutionally vague.[3]  We disagree.

We review sentencing conditions for an abuse of discretion.  *State v. Sanchez Valencia*, 169 Wn.2d 782, 791-92, 239 P.3d 1059 (2010).  Imposing an unconstitutional condition is always an abuse of discretion.  *State v. Bahl*, 164 Wn.2d 739, 753, 193 P.3d 678 (2008).

The due process vagueness doctrine under the Fourteenth Amendment of the U.S. Constitution and article I, section 3 of the Washington Constitution requires that citizens have fair warning of proscribed conduct.  *Bahl*, 164 Wn.2d at 752.  A community custody condition is unconstitutionally vague if either "(1) it does not sufficiently define the proscribed conduct so an ordinary person can understand the prohibition or (2) it does not provide sufficiently ascertainable standards to protect against arbitrary enforcement."  *State v. Padilla*, 190 Wn.2d 672, 677, 416 P.3d 712 (2018).

In deciding whether a term is unconstitutionally vague, we do not consider the term in a vacuum, rather, we consider the term in the context in which it is used.  *Bahl*, 164 Wn.2d at 754.  "If 'persons of ordinary intelligence can understand what the [law] proscribes, notwithstanding some possible areas of disagreement, the [law] is sufficiently definite.'"  *Bahl*, 164 Wn.2d at 754 (alterations in original) (quoting *City of Spokane v. Douglass*, 115 Wn.2d 171, 179, 795 P.2d 693 (1990)).

---

[3] Although he claims that the condition is also not crime related, Moreno-Hernandez provides no argument on the subject.  Therefore, we do not consider it.  *State v. Thomas*, 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004).

Here, the term "no contact" is sufficiently definite. Numerous cases have upheld "no contact" community custody conditions. *E.g.*, *State v. Corbett*, 158 Wn. App. 576, 601, 242 P.3d 52 (2010).

Moreno-Hernandez's reliance on *State v. Irwin*, 191 Wn. App. 644, 364 P.3d 830 (2015), is misplaced. In *Irwin*, the court addressed a community custody condition that prevented the defendant from "frequent[ing] areas where minor children are known to congregate, as defined by the supervising [community corrections officer]." 191 Wn. App. at 649 (second alteration in original). Washington courts have been inconsistent on whether the phrase "where minors congregate" is unconstitutionally vague. *See State v. Wallmuller*, 4 Wn. App. 2d 698, 704-13, 423 P.3d 282 (2018) (Lee, J., dissenting) (discussing cases), *review granted*, 192 Wn.2d 1009 (2019). The Washington Supreme Court recently granted review on the issue. No such inconsistency exists regarding "no contact."

In fact, "no contact" conditions are specifically authorized by statute, RCW 9.94A.703(3)(b). We conclude that the community custody is not unconstitutionally vague because persons of ordinary intelligence can understand what no contact with minors proscribes.

IV.    LFOs

Moreno-Hernandez argues that, due to the 2018 amendments to the LFO statutes, we should strike the $200 criminal filing fee the trial court imposed on him.

The State agrees that we should strike the $200 criminal filing fee. It also recognizes that we should strike the interest-accrual provision of Moreno-Hernandez's judgment and sentence. We accept the State's concessions.

We remand for the trial court to reconsider the imposition of LFOs. On remand, the trial court should consider all of the LFOs in light of the 2018 amendments to the LFO provisions, LAWS OF 2018, ch. 269, and *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018).

We otherwise affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, P.J.

I concur:

Sutton, J.

GLASGOW, J. (concurrence) — I agree with the majority that Jose Moreno-Hernandez's conviction should be affirmed. I write separately because I am troubled by the prosecutor's exchange with RY's mother, Nelbis Moreno, regarding the interpreter's mistranslation of her testimony. Rather than rely on the transcript of Moreno's prior testimony and rather than call the interpreter to explain the correct interpretation of Moreno's prior testimony, the prosecutor chose to question Moreno about the mistranslation, giving his own characterization of what Moreno had said and the meaning of Spanish words. In doing so, he repeated and repeatedly spelled "molestar."

The exchange subtly, but unnecessarily, appealed to the passions and prejudices of the jury in two ways. The interpreter explained that "molestar" means "bothering or annoying" rather than "molesting." Verbatim Report of Proceedings (VRP) at 1268. Still, the prosecutor's repeated use and spelling of the word likely reinforced the sexual connotation that "molest" conveys to an English speaker. The unusual exchange with this witness also unnecessarily and explicitly emphasized her status as a non-English speaker while simultaneously questioning her understanding of words in her native language.

FACTS

The victim, RY, and her mother, Moreno, immigrated to the United States from El Salvador. Moreno came to this country first and left her daughter in El Salvador with relatives for several years. RY became pregnant when she was 13. Believing her daughter was not safe, Moreno arranged for RY to travel to this country. RY reunited with her mother here in Washington, where her mother had married the defendant.

This case involved allegations of one instance of sexual abuse that RY made against the defendant. There was no physical evidence and there were no witnesses. Moreno sided with the

defendant and did not believe RY's allegations. The defense theory was that RY's accusations stemmed from resentment against her stepfather whom she resented and disliked.

Moreno was at work at a fast food restaurant when her daughter called the police to report that Moreno-Hernandez had attempted to rape her. Apparently in an attempt to undermine Moreno's credibility and question her loyalty to her daughter, the prosecutor attacked Moreno's failure to leave work immediately to be with her. Moreno explained that she was not told at that time that the accusation was one of sexual assault. She also did not have transportation and could not get a ride home from work until the end of her shift. It was in this context that the mistranslation occurred.

During Moreno's testimony, one of the interpreters incorrectly interpreted her use of the Spanish word "molestar" to the English word "molest." 7 VRP at 1251, 1260-61. Subsequently, the prosecutor used the word "molest" in two questions to Moreno. 7 VRP at 1253. First, the prosecutor asked: "[Y]ou got a call at 7:00 p.m. that indicated your daughter said that the defendant had molested her; you didn't ask your manager for a ride home at that moment?" 7 VRP at 1253. The defense counsel objected but was overruled. The prosecutor repeated the question but omitted the word "molest." 7 VRP at 1253. Moreno did not have the opportunity to respond specifically to the prosecutor's use of the word "molest." 7 VRP at 1253.

The second time the prosecutor used the word "molest" was when he asked: "[Y]ou're telling me that you told your manager, 'My daughter just told me she's being molested,' and he said, 'I won't give you a ride home?'" 7 VRP at 1253. Moreno did not respond directly but instead explained that she "couldn't express [her]self like that because [she didn't] speak English." 7 VRP at 1253.

19

At the end of the day, outside of the presence of the jury, the interpreter explained to the judge and counsel that in Spanish, "molestar" means "to bother" or "annoy" and does not have the sexual connotation that "molest" has in English. 8 VRP at 1268. The interpreter had mistranslated the word.

The next morning, the interpreter concisely explained to the jury the misinterpretation. The interpreter told the jury that "I misinterpreted the word for 'bothering' or 'unknowing' as 'molesting,' which has a sexual connotation." 8 VRP at 1268. The interpreter went on saying that "the [correct] word would be 'bothering' or 'annoying.'" 8 VRP at 1268.

The prosecutor then asked multiple follow-up questions to Moreno about how she understood his questions from the previous day.

> [Prosecutor]: Yesterday . . . you used the verb "molestar". . . . For the record that's M-O-L-E-S-T-A-R. . . . Correct?
>
> [Moreno]: Yes. That's so.
> . . . .
> [Prosecutor]: Okay. And so the interpreter at the time who was interpreting your answers, you used the word "*molestar*," correct?
>
> [Moreno]: Yes. That's so.
>
> [Prosecutor]: But then I asked the question, "You were aware"—or something to the effect that you knew that your daughter was saying that [the defendant] had molested your daughter, correct?
>
> [Moreno]: I was not conscious of this because she had not said anything to me, as I will repeat again.
>
> [Prosecutor]: So—but isn't it correct that the interpreter who was interpreting questions for me did not use the word "*molestar*"? She used "*abuso dehonesto*"—
>
> [Prosecutor]: Which for the record is A-B-U-S-O, "*abuso*," and "*deshonesto*" is D-E-S-H-O-N-E-S-T-O.
> . . . .
> [Prosecutor]: When I asked the followup question, I used the word—the word that was translated to you was *abuso deshonesto*, correct?

[Moreno]: My sister never said at any moment that he was being sexually inappropriate or that he had been naked or anything like that.

[Prosecutor]: That's not the question I just asked you; is it, Ms. Moreno Hernandez? Is it?

[Moreno]: But it's the same thing. It's the same thing when you're talking about sexual inappropriateness. And if that's not how I should understand it, explain it to me.

[Prosecutor]: So I'm going to repeat my question. My question is, when I asked the followup question yesterday, the verb that was translated from my question was not *molestar*. It was *abuso deshonesto*, correct?

[Moreno]: Well, I don't remember that you had—if you asked me that question.

[Prosecutor]: Okay. So you don't recall what you testified to yesterday afternoon?
. . . .
[Moreno]: Of course I did.

[Prosecutor]: Okay. So let's move on. Whatever you understood it to mean, you knew that your daughter had called the police, correct?

8 VRP at 1270-74. Later when the prosecutor asked Moreno about a conversation with her brother he returned to using and spelling Spanish.

[Moreno]: I only asked him what had happened. And he said that, yes, that my husband had been bothering, annoying, or pestering her.

[Prosecutor]: You used that verb *molestar* again just now.

[Moreno]: Yes. Because they didn't give me any explanation concerning what it was about.

[Prosecutor]: Okay. So [your brother], when he spoke to you, only told you—only used the verb *molestar* to describe what [RY] had said about what [the defendant] had done to her.

[Moreno]: Yes. That's so.

[Prosecutor]: Just like you're saying that [your sister] only used the word *molestar*, correct?

[Moreno]: Yes.
. . . .

21

[Prosecutor]: Sure. My question is, when you say that [your brother] used the word *molestar*, is it your understanding [your brother] observed the report that [RY] made to the police?

[Moreno]: Yes. That's so.

[Prosecutor]: If we're talking about someone taking down the pants of a 14-year-old girl and forcibly rubbing their penis between their leg, would you call that *molestar*, M-O-L-E-S-T-A-R?

[Moreno]: I didn't know anything about that.

[Prosecutor]: That's not my question; is it? My question is, that situation I described, where someone forcibly removes the pants of a 14-year-old girl and rubs their penis between her legs, would you use the word *molestar*, M-O-L-E-S-T-A-R, to describe that action?

[Moreno]: No. It's different.

[Prosecutor]: Right. That's *abuso deshonesto*—A-B-U-S-O D-E-S-H-O-N-E-S-T-O -- isn't it?

[Defense Counsel]: Objection.

8 VRP at 1286-87. The prosecutor then changed topics despite the court overruling the objection. Moreno did not have the opportunity to answer.[4]

ANALYSIS

I would conclude that the prosecutor's questioning was improper.

As a witness, Moreno was hostile to the State and the prosecutor had reason to encourage the jury to disbelieve her testimony. While the prosecutor was certainly entitled to point out inconsistencies in Moreno's testimony and to call her credibility into question, I am troubled by

---

[4] The prosecutor also questioned Moreno about her daughter's journey to the United States, emphasizing repeatedly that she had arranged for "a coyote to bring [RY] up . . . from El Salvador to Texas," incorrectly alleging that Moreno was trying to deny that fact. 7 VRP at 1235 Moreno did not deny paying someone to get RY to Texas. Defense counsel objected three times and was overruled each time. It is unclear what probative value the circumstances of RY's immigration would have had in this trial. But the defendant did not assign error or allege prosecutorial misconduct with regard to this line of questioning.

the prosecutor's questions described above for two reasons. First the prosecutor relied on his imperfect recollection of Moreno's prior testimony and his understanding of the proper translation of the Spanish words rather than using a transcript of the precise prior testimony or calling the interpreter to explain the translation. Second, the way the prosecutor handled the exchange appeared designed to appeal to the passions or prejudices of the jury and focus on Moreno's ethnicity, potentially appealing to unconscious bias.

A prosecutor must zealously pursue justice but that pursuit is not without boundaries. *State v. Case*, 49 Wn.2d 66, 70-71, 298 P.2d 500 (1956). Prosecutors have a duty to the defendant to ensure their rights to a fair trial are upheld. *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). Prosecutors "[w]ith the power of the state at their disposal" must always remember "'that a fearless, impartial discharge of public duty, accompanied by a spirit of fairness toward the accused, is the highest commendation they can hope for.'" *State v. Ollivier*, 178 Wn.2d 813, 860, 312 P.3d 1 (2013) (quoting *State v. Warren*, 165 Wn.2d 17, 27-28, 195 P.3d 940 (2008)).

Prosecutors commit misconduct when they use arguments designed to arouse the passions or prejudices of the jury. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). Such arguments create a danger that the jury may convict for reasons other than the evidence. *See State v. Ramos*, 164 Wn. App. 327, 338, 263 P.3d 1268 (2011), *as amended* (Feb. 27, 2012).

Rather than relying on the interpreter's explanation of the nuances of the Spanish translation of the words "molestar" and "abuso dishonesto," or calling the interpreter to testify about the previous day's translation, or using the transcript, the prosecutor engaged in a long examination of the witness based on his recollection of what was said and his understanding of

the meanings of the Spanish words. In doing so, he more than once spelled "m-o-l-e-s-t-a-r" and "a-b-u-s-o d-i-s-h-o-n-e-s-t-o."

The interpreter made it perfectly clear to the jury that the Spanish word "molestar" had been misinterpreted the day before. But the prosecutor kept using and emphasizing the word, which carries no sexual connection in Spanish, but an English speaker would very likely find it difficult to set aside a sexual connotation when hearing the word. This exchange, including the spelling of the word "molestar," is concerning because there appears to be no purpose other than to arouse an emotional response.

In addition, the exchange expressly focused both on the witness's status as a non-English speaker while simultaneously questioning her understanding of words in her own language. Appealing to a juror's bias is not always obvious. *Monday*, 171 Wn.2d at 678. "Perhaps more effective but just as insidious are subtle references." *Id*. Careful placement of words scattered throughout the proceedings can improperly influence the jury "[l]ike wolves in sheep's clothing." *Id*.

"Even a reference that is not derogatory may carry impermissible connotations, or may trigger prejudiced responses in the listeners that the speaker might neither have predicted nor intended." *Id.* at 684 (Madsen, J concurring). "'In cases where race should be irrelevant, racial considerations, in particular, can affect a juror's impartiality and must be removed from courtroom proceedings to the fullest extent possible.'" *Id.* (quoting *State v. Varner*, 643 N.W.2d 298, 304 (Minn. 2002)). A prosecutor should never appeal to racial biases to achieve convictions. *Monday*, 171 Wn.2d at 676.

Here the prosecutor's extended and unusual exchange with this witness could have appealed to the jury's unconscious bias. It focused the jury's attention on Moreno's ethnicity

and immigration status, and questioned her understanding of words in her own language.[5] It is difficult for us, when reading a cold record, to gauge the impact that this focus on ethnicity and immigration status might have had on the jury. But even subtle focus that could improperly invite unconscious bias to impact the jury's view of a witness's credibility should be studiously avoided, especially by prosecutors.

Even so, although the prosecutor's questioning of Moreno was improper, I agree with the majority that it was not prejudicial. Generally, improper conduct is considered prejudicial if "'there is a substantial likelihood the misconduct affected the jury's verdict.'" *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)). Here, I find no substantial likelihood the questioning ultimately affected the jury's verdict for three reasons.

First, despite the prosecutor's muddying of the waters, the interpreter's correction was clear and concise in telling the jury that a misinterpretation occurred and what it was.

Second, Moreno was firm and clear in her answers throughout this line of questioning. She continued to clearly state that the word she used did not have a sexual meaning, she never intended her answer to have a sexual meaning, and she never understood another's use of "molestar" to have a sexual meaning.

Finally, after the prosecutor's questioning, the trial court offered Moreno-Hernandez the opportunity to call the interpreter again to clarify any confusion that might have been created. The defense declined this opportunity. Had the defense believed there was still potential for jury confusion, it could have called the interpreter, but did not find it necessary to do so.

---

[5] This is even more troubling when considering that the prosecutor also separately focused on the immigration status of the witnesses and the nature of the arrangements that Moreno made to bring her daughter to this country.

With regard to the potential appeal to unconscious racial bias, the questioning here does not rise to the level of impropriety that occurred in *Monday*, 171 Wn.2d 667. There, the prosecutor expressly argued that the defense witnesses should be discounted because "the code is black folk don't testify against black folk. You don't snitch to the police." *Id.* at 674. While I am troubled by the prosecutor's emphases in questioning Moreno in this case, I do not conclude that questioning her is comparable to the misconduct that occurred in *Monday*.

CONCLUSION

In sum, I agree with the majority that the conviction should be affirmed. Nevertheless, prosecutors, especially, should take care to avoid appeals to bias like those that occurred in this case, even subtle ones.

_____
Glasgow, J.